IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EUGENIA E. WILCOX, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 07-2645 |
| v. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **OPINION** |
| Defendant. | |

APPEARANCES:

Alan H. Polonsky, Esquire
Polonsky & Polonsky, Attorneys at Law
512 South White Horse Pike
        Attorney for Plaintiff

Christopher J. Christie
United States Attorney
        By:  Andreea L. Lechleitner
             Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
        Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2006), to review the final decision of the Commissioner of the Social Security Administration ("Defendant") denying the application of Claimant Eugenia E. Wilcox ("Claimant") for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("the Act"), 42 U.S.C. §§ 401-434.  This
Court must determine whether the decision of Administrative Law
Judge ("the ALJ"), Joseph A. Pachnowski, that Claimant was not
disabled within the meaning of the Act between January 3, 1994
and September 30, 1997, is supported by substantial evidence.

Claimant brings four challenges, arguing that the ALJ: (1)
failed to support his determination of her residual functional
capacity ("RFC") with substantial evidence; (2) failed to use a
medical expert to infer Claimant's disability onset date as
required by the Social Security regulations; (3) failed to follow
the Social Security regulations regarding vocational evidence;
and (4) failed to assess the credibility of Claimant's subjective
complaints in a manner consistent with the requirements of the
Social Security Administration.  Because the Court finds that the
ALJ failed to explain his observation that Claimant had
"significant additional limitations" beyond those that might
enable performance of light work, and the ALJ failed to consider
relevant medical evidence of obesity in assessing Claimant's RFC,
the Court will vacate the decision of the Commissioner denying
Claimant's application for DIB and remand for further proceedings
consistent with this Opinion.

I.   **BACKGROUND**

   A.   **Procedural History**

Claimant filed applications for DIB and Supplemental

Security Income ("SSI") payments on August 24, 1989, and was denied on both requests on March 15, 1991. (R. at 12.) Claimant did not request an appeal regarding the former applications. (Id.) On April 21, 2004, Claimant filed her current applications for both benefits alleging a disability onset date of January 3, 1994, due to the effects of congestive heart failure, asthma, sleep apnea, hypertension, an enlarged thyroid, and obesity. (R. at 87.) Nachelle Broach ("Ms. Broach"), of the Division of Disability Determination Services ("DDS"), assessed Claimant's applications. (R. at 77.) Ms. Broach found that ". . . there [was] insufficient information to rate the claim for the [DIB application], [though] there [was] sufficient [information] for the [SSI application]." (Id.) Ms. Broach found that Claimant met the disability requirement for the SSI application and was approved with an onset date of April 1, 2004.[1] (R. at 12, 77.)

However, the DIB application was denied and Claimant filed a request for reconsideration on November 30, 2004, and this too

---

[1] Claimant was disabled for the purposes of SSI because the agency found she was disabled at the time she filed her application. See 42 U.S.C. § 1382. However, in order for Claimant to qualify for DIB, she needs to show that she was disabled prior to September 30, 1997, the undisputed date on which her DIB insurance expired. See 42 U.S.C. § 416 (requiring beneficiary to have worked for at least 20 quarters in the past ten years). Claimant has acknowledged that September 30, 1997 was the date last insured. See (Claimant's Br. at 5.) Although Claimant's brief mentions once that the date last insured was December 31, 2002, this appears to be a typographical error. (Claimant's Br. at 15.)

3

was denied on March 3, 2005.  (R. at 39-43.)  Claimant filed a request for a hearing on March 22, 2005.  (R. at 44.)  After the hearing on January 20, 2006, the ALJ issued his decision denying the DIB application on March 15, 2006.  (R. at 12, 44.)

The ALJ found that Claimant did not suffer from a disability on or before September 30, 1997, which was the date she was last insured for such benefits.  (R. at 12, 80.)  On March 27, 2006, Claimant filed a request for review of the ALJ's decision, which was denied by the Appeals Council on May 14, 2007.  (R. 296-301, 5-7.)  Thus, the decision of the ALJ became the final decision of the Commissioner.  Claimant timely filed this action before the Court.

**B.   Evidence in the Record**

1. Plaintiff's Testimony on January 20, 2006

Claimant, Eugenia E. Wilcox, was born on February 16, 1945. (R. at 65.)  Claimant received her GED in 1969, completed college, and has a master's degree in education.  (R. at 305.) Claimant worked as a full-time teacher and as an on-call substitute teacher from 1976 - 1992.  (R. at 96, 305-07.)  Her most recent job was at Haddon Heights High School as an on-call substitute teacher in 2002.  (R. at 305.)

According to Claimant, her job requirements as a teacher included: standing at and writing on the chalkboard, maintaining discipline while teaching, and carrying 50 pounds of paper

4

(including lesson plan book) occasionally and 25 pounds of paper frequently.[2] (R. at 97.) Claimant alleged that her position required her to walk, stand, climb, kneel, handle objects, and write for seven hours. (Id.) In addition, Claimant alleged that she was required to sit for an hour. (Id.)

Claimant testified that her pain became progressively worse over time beginning in January of 1994. (R. at 307-08.) At that time she stopped working because of the unbearable pain in her knees and arms, and drowsiness caused by her hypertension medication. (Id.) During the hearing with the ALJ, Claimant testified that she could not walk more than fifty feet. (R. at 308.) When the ALJ questioned Claimant about a recommended knee surgery, she stated that one of her doctors made the recommendation in 1994 and that the doctor continued to recommend this type of surgery. (R. at 308.) However, Claimant feared the surgery due to negative feedback she received from acquaintances who underwent the surgery. (Id.) Claimant testified that it was hard for her to stand or sit and write on the blackboard due to the pain in her knees and arms. (R. at 309.) During the hearing, Claimant complained that her asthma caused her to have shortness of breath while walking up and down flights of steps at work. (R. at 309.) Claimant stated that she was embarrassed

---

[2] Claimant taught five classes daily, which consisted of 30 to 40 students in each class. (R. at 97.)

5

because she fell asleep in class.  (Id.)

Although Claimant's Work History Report[3] shows that she stopped working in 1992, she testified that she worked for a short while in 1996, 1998, 1999, and 2002 (she earned $130 in 1996, $480 in 1998, $180 in 1999, and $520 in 2002).  (R. at 309.)  She testified that she went back to work because she loved teaching but could not continue to work because it was hard for her to walk around the school.  (R. at 310.)  Besides this source of income, the only disability benefit that she received was SSI.  (R. at 310-11.)

Claimant testified that three of her adopted children are her dependents.  (R. at 67.)  Two of the three dependent children live with Claimant and she testified that since 1993 they have assisted her with bathing, dressing, and shopping.  (R. at 312.)  Claimant stated she was seen by various doctors including Dr. Goldstein, Dr. Colopinto, and Dr. Siddiqi.  (R. at 313.)  Claimant testified that both Dr. Goldstein and Dr. Colopinto diagnosed her with fibromyalgia.[4]  (Id.)  Claimant also discussed her weight gain and stated that it could be caused by the

---

[3] The Work History Report gives a detailed account, according to Claimant, of the job positions she held, the length of time she was at each job, and what her job requirements were. (R. at 96-103.)

[4] Fibromyalgia is a disease that causes pain and stiffness in the muscles and joints that has multiple trigger points. Dorland's Illustrated Medical Dictionary 711 (31st ed. 2007).

steroids given to her to assist her in moving her arms.  (R. at
314.)  Claimant continued to explain that she suffers from sleep
apnea, and that she uses a Continuous Positive Air Pressure
("CPAP")[5] machine to help her sleep at night.  (R. at 315.)
Claimant also spoke about her trouble with sitting and stated
that it was hard for her to sit with her back erect due to the
pain it caused her.  (R. at 316.)  She reiterated that these were
the reasons why she gave up teaching.  (Id.)  When asked by her
attorney, Mr. Polonsky, if she thought she could do any other
work that would require her to be on her feet for more than two
hours she stated that she could not because of this pain.  (R. at
317.)  Even though Claimant had a cane with her at the hearing,
she refused to use one ten years prior to the hearing because she
was too embarrassed and wanted to give off the image that she was
a healthy teacher.  (Id.)  During the ALJ's examination of
Claimant, she stated that there was another health condition that
plagued her after 1994 – incontinence, which she claimed began
between 1993 or 1994.  (R. at 320.)

_____

   [5] CPAP is a respiratory therapy technique used in either
spontaneously breathing or mechanically ventilated patients.
CPAP, by pressurization of the ventilatory circuit, helps the
airway pressure maintain above atmospheric pressure during the
respiratory cycle.  Stedman's Medical Dictionary 1558 (28th ed.
2006).  CPAP can be used to treat congestive heart failure, acute
pulmonary edema, obstructive sleep apnea, and other conditions.
Taber's Cyclopedic Medical Dictionary 1769 (20th ed. 2005).

    2.   <u>Medical Reports Prior to September 30, 1997 (Date Last Insured)</u>

        a.   <u>Treatment History by Dr. Jack Goldstein-Treating Physician</u>

A prescription note dated June 19, 1990, is the only documentation in the record that shows Claimant was seen by Dr. Jack Goldstein ("Dr. Goldstein"), a doctor of osteopathic medicine. (R. at 145.) During this appointment Dr. Goldstein diagnosed Claimant with fibromyalgia and arthritis in the spine and knee. (<u>Id.</u>) Dr. Goldstein opined that she was totally disabled. (<u>Id.</u>)

        b.   Treatment History by Primary Physician

Claimant's primary care physician, Dr. Christopher Colopinto ("Dr. Colopinto"), a doctor of osteopathic medicine, treated her from May 9, 1982 to October 9, 2005. (R. at 246, 277-294.) During the relevant time period, Dr. Colopinto treated Claimant's degenerative joint disease and hypertension. (Id.) On February 22, 1990, Dr. Colopinto wrote that Claimant weighed 219 pounds and her blood pressure was 120/70. (R. at 293.) On March 20, 1990, Dr. Colopinto noted that Claimant weighed 221 pounds and her blood pressure was 110/70. (R. at 290.) During this visit Claimant complained of neck pains she experienced at night. (<u>Id.</u>) In addition, Dr. Colopinto diagnosed Claimant with

degenerative joint disease, and placed her on Voltaren.[6]  (Id.)
On April 18, 1990, Dr. Colopinto recorded Claimant's back and
shoulder pain and her weight at 227 pounds.  (R. at 289.)
Claimant was seen again by Dr. Colopinto on May 22, May 31, and
October 8 of 1990.  During these visits Claimant alleged she
experienced the same back, neck, and shoulder pains; and her
weight and blood pressure fluctuated, with her highest weight
being 226 pounds and her highest blood pressure 100/70 – though
this is considered "low normal" blood pressure.  (R. at 287-88.)
Specifically on October 8, 1990, Dr. Colopinto noted swelling in
Claimant's hands, inflammation in her uvula[7], hoarseness in her
voice, and she complained that her coughs got worse at night.
(R. at 287.)  Dr. Colopinto prescribed her Codeine[8] to relieve
her pain and Amoxil[9] to treat her infections.  (Id.)

Claimant saw Dr. Colopinto a year later on September 28,

---

[6]  Voltaren is used to treat rheumatic arthritis,
osteoarthritis, and other conditions.  Voltaren contains
diclofenac, which relieves pain and inflammation in joints.
Physicians' Desk Reference 2299 (62d ed. 2008).

[7]  The uvula is "the free edge of the soft palate that hangs
at the back of the throat above the root of the tongue." Taber's
Cyclopedic Medical Dictionary 2283 (20th ed. 2005).

[8]  Codeine is a prescription drug used as an analgesic (pain
reliever) and antitussive (cough remedy).  Stedman's Medical
Dictionary 404 (28th ed. 2006).

[9]  Amoxil or amoxicillin is used to treat or prevent
infections that are caused by bacteria.  Physicians' Desk
Reference 1325 (62d ed. 2008).

1991.  The doctor noted that Claimant weighed 239 pounds and her blood pressure was 120/80.  (R. at 287.)  Dr. Colopinto also made note that Claimant needed all of her medications and added Vicodin[10] and Procardia[11] to her list of medications.  (Id.) Another year passed before Claimant went to see Dr. Colopinto again, on September 10, 1992.  (R. at 286.)  At that time he only noted her weight – 242.5 pounds.  (Id.)  On June 19, June 21, October 8, and October 21 of 1993, Claimant's blood pressure and weight were monitored and she was prescribed all of the medication she previously received.  (R. at 284.)

On October 22 to October 25 of 1993, Antinuclear Antibody[12] and Rheumatoid Fact[13] tests were performed on Claimant and her results were in normal range, thus Claimant did not suffer from

---

[10]  Vicodin is a hydrocodone biartrate (an opioid) prescribed as a severe pain reliever.  Physicians' Desk Reference 510 (62d ed. 2008).

[11]   Procardia is prescribed to treat hypertension. Physicians' Desk Reference 841 (62d ed. 2008).

[12]  Antinuclear antibodies "show an affinity for nuclear antigens" and are found in the serum of patients with rheumatoid arthritis.  "Different antinuclear [antibodies] generate distinctive patterns on immunofluorescence staining tests.  These patterns have clinical relevance and reflect which nuclear constituents are generative specific antibody responses." Stedman's Medical Dictionary 103 (28th ed. 2006).

[13]  Rheumatoid Factor is present in "roughly 80% of patients with rheumatoid arthritis . . . this factor is used, with other clinical indicators, in the diagnosis and management of rheumatoid arthritis."  Taber's Cyclopedic Medical Dictionary 1909-10 (20th ed. 2005).

rheumatoid arthritis.  (R. at 281-82.)  On February 18, 1994, Dr. Colopinto refilled Claimant's prescription for Procardia.  (Id.) On April 28, 1994, Dr. Colopinto noted her hypertension and degenerative joint disease.  (R. at 280.)

On October 3, 1995, Dr. Colopinto noted Claimant's physical progress in relation to her impairments.  (R. at 279.)  Dr. Colopinto stated that her heart had a regular rhythm with no murmurs, her abdomen had no masses, her weight was 242 pounds, and her blood pressure was 134/90.  (Id.)  On June 25, 1996, Dr. Colopinto's notes were similar besides her increase in weight and blood pressure (252.75 pounds and 160/90, respectively).  (Id.)

       c.   Treatment History at Osborn Family Health
           Center-Treating Physicians

Claimant sought treatment at the Osborn Family Health Center ("OFHC") from July 19, 1996 to December 30, 2002.  (R. at 165-96.)  During the relevant time period, the doctors at OFHC only treated Claimant's hypertension, obesity, fibromyalgia, degenerative joint disease, and asthma.  (Id.)  On her initial visit, Claimant stated that she suffered from chest pains and dizziness.  (R. at 194.)  Claimant also stated that she was interested in losing weight.  (Id.)  At that point in time she weighed 257.5 pounds and her blood pressure was 164/88.  (Id.) Dr. Thomas Sexton ("Dr. Sexton"), the primary physician who cared

for Claimant, noted that Claimant had no neck vein distension[14],
no masses or enlargement of her thyroid, and her heart was at a
regular rhythm (no murmur or gallop).  (R. at 194.)  Dr. Sexton
also noted that Claimant did not suffer from any sensory motor
cerebellar[15] abnormalities; her CN II-XII[16] were intact; her
Babinski's reflex[17] was normal; she had no edema[18], cyanosis[19] or
clubbing in her extremities; and none of her lymph nodes were
palpable.  (R. at 195.)  Dr. Sexton noted that Claimant suffered
from hypertension and obesity.  (Id.)  On July 22, 1996, the

---

[14]  Distention is the state of being enlarged.  Dorland's
Illustrated Medical Dictionary 562 (31st ed. 2007).

[15]  Cerebellar means relating to the cerebellum.  Stedman's
Medical Dictionary 349 (28th ed. 2006).

[16]  CN II-XII refers to the following cranial nerves: the
optic nerve (CN II), the oculomotor nerve (CN III), the trochlear
nerve (CN IV), the trigeminal nerve (CN V), the abducens nerve
(CN VI), the facial nerve (CN VII), the vestibulocochlear nerve
(CN VIII), the glossopharyngeal nerve (CN IX), the vagus nerve
(CN X), the accessory nerve (CN XI), and the hypoglossal nerve
(CN XII).  Stedman's Medical Dictionary A21 (28th ed. 2006).

[17]  Babinski's reflex is the "dorsiflexion of the great toe
when the sole of the foot is stimulated.  Normally, when the
lateral aspect of the sole of the relaxed foot is stroked, the
great toe flexes.  If the toe extends instead of flexes and the
outer toes spread out, Babinski's reflex is present." Taber's
Cyclopedic Medical Dictionary 211 (20th ed. 2005).

[18]  Edema is "the presence of abnormally large amount of
fluid in the intercellular tissue spaces of the body, usually
referring to subcutaneous tissues." Dorland's Illustrated
Medical Dictionary 600 (31st ed. 2007).

[19]  Cyanosis occurs when the skin and mucous membrane appear
to be bluish or purplish.  It is due to deficient oxygenation of
the blood.  Stedman's Medical Dictionary 475 (28th ed. 2006).

examination chart showed that Claimant may need a stress test, her weight was 260 pounds, and her blood pressure improved to 140/70.  (R. at 193.)  During Claimant's examination on July 26, 1996, Dr. Sexton advised her of her high cholesterol.  (R. at 192.)  On September 17, 1996, Claimant's examination chart showed that she weighed 260 pounds, her blood pressure was 130/90, and she was still interested in losing weight.  (R. at 191.)  Dr. Sexton also treated Claimant's hypertension with Procardia, as did Dr. Colopinto.  (Id.)  In addition, Dr. Sexton placed Claimant on a new drug called Redux[20] (15mg), and advised her to exercise, which included walking, due to the Claimant's interest in losing weight.  (Id.)

Claimant returned to the OFHC for a follow-up appointment and to refill her prescription of Procardia on October 1, 1996. (R. at 190.)  Her weight at that time was 258 pounds and her blood pressure was 150/96.  (Id.)  Dr. Sexton informed her about her hypertension and obesity again, and continued to prescribe her Procardia (3mg) and Redux (15mg).  (Id.)  On October 1, 7, and 21 of 1996 Dr. Sexton noted the fluctuation in Claimant's weight and blood pressure, and again noted her hypertension and obesity.  (R. at 188, 189.)

On December 19, 1996, Claimant's blood pressure was listed

---

[20]  Redux was a weight loss drug taken off the market in September of 1997 due to "devastating side effects."  Stephen S. Hall, Success is Like a Drug, N.Y. Times, Nov. 23, 1997, at 65.

13

as 156/88 and Dr. Sexton stopped her prescription of Redux, yet
noted that Claimant was noncompliant in taking her medication to
treat her hypertension.  (R. at 186.)  In addition, Dr. Sexton
prescribed Adalat[21] to treat her hypertension instead of
Procardia.  (Id.)  On January 10, 1997, Claimant refused to be
weighed and Dr. Sexton recorded her blood pressure as 150/92.
(R. at 185.)  Claimant told Dr. Sexton that she wanted him to
examine her arthritis because she complained that it was getting
worse.  (Id.)  During this visit, OFHC first diagnosed her with
fibromyalgia and degenerative joint disease.  (Id.)  On February
18, 1997, the Claimant complained of having an asthma attack and
Dr. Sexton noted that Claimant had a cough and wheezed.  (R. at
184.)  Dr. Sexton prescribed her Cedax[22], Proventil[23], and
Robitussin.  (Id.)  From April 9, 1997 to July 21, 1997, OFHC
noted that Claimant weighed 260 pounds and her blood pressure was
150/90.  (R. at 183.)  Dr. Sexton refilled her medication and
noted that Claimant was feeling well.  (Id.)

---

[21]  Adalat is used for the treatment of hypertension.
Physicians' Desk Reference 2979 (60th ed. 2006).

[22]  Cedax is an antibiotic used to treat bacterial
infections such as bronchitis, tonsilitis, and otitis (ear
infection).  The Penetrating Power of Cedax,
http://www.cedax.com/ (last visited June 30, 2008).

[23]  Proventil is an inhalation aerosol that contains
albuterol, which is used to treat asthma attacks.  Physicians'
Desk Reference 3002 (62d ed. 2008).

14

     d.   Dr. Siddiqi - Treating Physician

    Claimant was referred by both Dr. Ira Stark, a physician for DDS, and Dr. Colopinto to receive an examination by Dr. Tariq Siddiqi, a neurosurgeon, in order to get a more thorough evaluation of Claimant's conditions. (R. at 270.) On March 5, 1990, Dr. Siddiqi noted the same pain that Claimant complained of to Dr. Stark. (Id.) He observed that her medical history included hypertension and a heart murmur and that at the time of the visit she was taking Lozol with Motrin, Tylenol #3, and Volteran. (Id.) Dr. Siddiqi stated that Claimant was 5'7'' tall and weighed 212 pounds. (Id.) Claimant's nerve examination produced results within the "normal limits," and there was mild tenderness in the paracervical area on the right side. (Id.) Dr. Siddiqi noted that she had some difficulty moving both shoulders above the horizontal. (Id.) Similar to Dr. Stark's examination, Dr. Siddiqi found no focal motor deficit. (Id.) Dr. Siddiqi wrote "I think Eugenia Wilcox may have: degenerative cervical arthritis and possible involvement of both shoulder joint areas." (Id.) Dr. Siddiqi scheduled a CT scan of her cervical spine and stated that she was a candidate for an orthopedic opinion regarding her shoulder. (Id.)

    On April 5, 1990, Dr. Siddiqi wrote to Dr. Stark and Dr. Colopinto, informing the doctors of his follow-up appointment with Claimant. (R. at 144.) He noted that Claimant had "some

15

spondylitic changes"[24] in her cervical spine, and he added that there was no evidence of a herniated disc.  (R. at 144.)  Dr. Siddiqi discussed these changes with Claimant and said they were predominantly due to arthritis, and for this he gave her a prescription for Vicodin.  (R. at 122.)

> e.  <u>Dr. Ira Stark - Consultative Physician</u>

Documentation of Claimant's impairments dates back to her initial visit with Dr. Stark, on May 9, 1983.  (R. at 140.) Claimant's most recent visit with Dr. Stark took place on March 20, 1990; he diagnosed her with cervical degenerative joint disease due to the results of her CT scan of her cervical spine. (<u>Id.</u>)  On February 14, 1990, Dr. M. Goldenberg, the physician who administered the CT scan, noted that the scan revealed ventral spondylitic and degenerative changes in her cervical spine.  (R. at 140-42.)  Dr. Stark noted in Claimant's range of motion evaluation that her muscles "were equal bilaterally with no decreased range of motion."  (<u>Id.</u>)  He also noted Claimant's pain, and stated the pain in her neck and shoulder radiated occasionally to her head and her spine.  (<u>Id.</u>)  Dr. Stark stated that Claimant was "unable to raise her arms above the horizontal bilaterally."  (<u>Id.</u>)

---

[24]  Spondylitic means of or relating to spondylitis. Spondylitis occurs when there is inflammation of the vertebrae (one of the segments of the spinal column).  <u>Stedman's Medical Dictionary</u> 1813 (28th ed. 2006).

16

3.    Medical Reports after September 30, 1997

a.    October 1997 to December 1999

Because it is undisputed that September 30, 1997 is the date
Claimant was last insured for DIB benefits, the medical records
after that date are only relevant to show whether she was
disabled prior to October 1997.

Claimant visited OFHC for a refill of Procardia on December
31, 1997.  (R. at 182.)

On February 19, 1998, Dr. Colopinto noted that Claimant's
arthritis was very painful and she had chest pains.  (R. at 276.)

Claimant returned to OFHC for treatment on April 20, 1998.
(R. at 182.)  At that time she weighed 267 pounds and her blood
pressure was 158/82.  (R. at 182.)  From July 2, 1998 to August
4, 1998, the doctors continued to refill her prescriptions and
noted the small changes in her weight and blood pressure.  (R. at
177-78.)  On November 17, 1998, Dr. Sexton noted that Claimant
suffered from sleep apnea.  (R. at 175.)

A year passed before Claimant returned to Dr. Colopinto in
February of 1999.  (R. at 276.) Claimant's chief complaints to
Dr. Colopinto included: sore throat, headaches, awaking with
blood in her throat, coughing, problems with her balance, and
trouble sleeping.  (Id.)  During this visit, and including the
visits on May 6 and June 22 of 1999, Claimant's heart had a
regular rhythm with no murmurs, and no masses were in her

17

abdomen.  (R. at 274, 276.)  On the latter date Dr. Colopinto
also refilled her prescription for Procardia.  (Id.)  In December
of 1999, Claimant complained of knee pain because she "slipped
off steps."  (R. at 273.)  Dr. Colopinto noted that her asthma
"may" have returned and her blood pressure was 165/99.  (Id.)

        b.    <u>January 2000 to the Present</u>

    Dr. Colopinto conducted Claimant's physical exam on February
10, 2000, which revealed that she had no heart murmurs or masses
in her abdomen.  (Id.)  On October 4, 2000, Dr. Colopinto
reviewed results of multiple tests that were run on September 30,
2000, and found that Claimant suffered from high cholesterol and
had a "higher than average risk of CHD."[25]  (R. at 265.)  During
a check-up on November 28, 2000, Claimant weighed 276 pounds.
(R. at 262.)  Dr. Colopinto again noted Claimant's hypertension
and her physical exam also showed that she had no heart murmur or
masses in her abdomen.  (Id.)

    Claimant went to the emergency room at Kennedy Health System
in Stratford, NJ on June 4, 2001 for exacerbation of asthma.  (R.
at 146.)  Dr. Ronald Dupler, the admitting and attending
physician, diagnosed her with bronchitis.  (R. at 147.)  In
Claimant's initial assessment, Dr. Dupler noted that Claimant

_____

      [25]  CHD stands for coronary heart disease, also known as
ischemic heart disease, which causes "cardiac disabilities
resulting from insufficient supply of oxygenated blood to the
heart."  <u>Dorland's Illustrated Medical Dictionary</u> 538, 543 (31st
ed. 2007).

suffered from "labored respirations" and she had a fever.  (R. at 149-51.)  Dr. Dupler mentioned Claimant's medical history and he stated that Claimant suffered from hypertension and asthma.  (R. at 150.)  Dr. Dupler conducted various assessments including: a stomach exam, a genitourinary exam, a muscle exam, a skin exam, and a pain intensity exam.  (R. at 151.)  Dr. Dupler found that Claimant's abdomen, urinary organs, and skin were within normal limits. (Id.)  Dr. Dupler also found that Claimant's intensity of pain was at level zero.  (Id.)  Dr. Dupler noted that Claimant was alert and "oriented to time, person, [and] place.  [She could] follow commands[,] speak clearly[, and] respond to visual/auditory stimuli."  (R. at 152.)  Dr. Dupler treated Claimant's illnesses by prescribing her Zithromax[26], Proventil, and Prednisone[27].  (R. at 154)

On February 25, 2002, Claimant's OFHC progress chart showed that she was in no acute distress, was obese (weighed 280 pounds), and her blood pressure was 180/100.  (R. at 173-74.) Claimant stated that she "feels like [she] is going to choke at night" due to her asthma.  (Id.)  Dr. Sexton also noted that she was borderline diabetic and had a heart murmur.  (Id.)  Dr.

---

[26]  Zithromax is a prescription drug used to treat mild to moderate infections.  Physician's Desk Reference 2564 (60th ed. 2006).

[27]  Prednisone is a anti-inflammatory prescription drug that contains steroidal compounds.  Stedman's Medical Dictionary 449, 586, 1553 (28th ed. 2006).

19

Sexton also made a notation of her previous diagnoses, which included: sleep apnea, nocturnal dyspnea[28], and hypertension. (Id.)  Lastly, he noted that Claimant suffered from chest pressure, wheezing, and a cough.  (Id.)  Dr. Sexton counseled and told Claimant to decrease her caloric intake, decrease the consumption of dietary fat, and exercise by walking 20 minutes. (Id.)  Dr. Sexton did not specify if Claimant should exercise daily.  (Id.)  In addition, Claimant did not have to seek clearance from Dr. Colopinto before engaging in exercise.  (Id.)

According to the records taken from OFHC, from March 4, 2002 to May 16, 2002, Claimant's health remained the same, though she lost four pounds (weight: 276 pounds).  (R. at 168-71.)  On September 4, 2002, Claimant weighed 277 pounds and her blood pressure was 120/80.  (R. at 166.)  Dr. Sexton noted that Claimant had adequate respiratory effort, her lungs were clear, and her heart had a regular rhythm with no murmur or gallop. (Id.)

On March 20, 2003 Claimant returned to Dr. Colopinto.  (R. at 260.)  During the visit he noted that she weighed 285.5 pounds.  (Id.)  He also noted that Claimant's asthma had worsened, her wheezing had increased, and her trouble with sleeping at night had worsened.  (Id.)  Claimant complained that

---

[28]  Dyspnea occurs when one has difficulty in breathing. It is usually associated with diseases of the heart or lungs. Stedman's Medical Dictionary 601 (28th ed. 2006).

she had fevers and chills; edema in her feet; and pain, sensitivity and numbness in her left thumb.  (Id.)  Due to Claimant's complaints, Dr. Colopinto examined her thumb and recorded Claimant's decreased sensation and tenderness in her thumb when he pricked it.  (Id.)

In a letter dated November 4, 2003 to the Camden County Council on Economic Opportunity, Dr. Colopinto stated that Claimant "will be seriously endangered without summer cooling due to [her] stage B congestive heart failure, hypertension, asthma, and osteoarthritis."  (R. at 259.)  On April 6, 2004, Dr. Colopinto ordered an examination of Claimant's chest at The Cooper Health System.  (R. at 258.)  There, Dr. Stephen A. Levin found that despite Claimant's cough, her lungs were clear, her heart appeared normal in size with mild "uncoiling of the thoracic aorta, her pulmonary vasculature appeared normal, and her bony thorax appeared intact."  (Id.)

Claimant's "Patient Progress Notes" from Dr. Colopinto on February 27, April 6, and May 6 of 2004 all depict slight fluctuation in her weight (an increase from 296 pounds to 300 pounds), notations of her medication (DynaCirc[29] and Micardis HCT[30]), a listing of her impairments (sleep apnea, hypertension,

---

[29]  DynaCirc CR is a prescription drug used to treat hypertension.  Physicians' Desk Reference 2698 (62d ed. 2008).

[30]  Micardis HCT is a prescription drug used to treat hypertension.  Physicians' Desk Reference 847 (62d ed. 2008).

fibromyalgia, osteoarthritis, and congestive heart failure), and a record of her physical examinations (same as listed above). (R. at 256.)

On May 11, 2004, Dr. Colopinto assessed Claimant's health for DDS.  (R. at 246.)  Dr. Colopinto noted that he saw Claimant every two to six months; listed her diagnoses (hypertension, congestive heart failure, obstructive sleep apnea, osteoarthritis, and allergies); and noted her weight and blood pressure had increased.  (Id.)  During the May 11, 2004 examination, Dr. Colopinto noted that he could not provide a medical opinion regarding Claimant's ability to do work-related activities (R. at 251) although Dr. Colopinto noted that Claimant was limited to twenty pounds of occasional lifting, less than two hours of walking, and less than six hours of sitting, and limited in the ability to push and pull objects.  (R. at 250).

Dr. Colopinto sent Claimant to see Dr. Ghada Haddad, who specializes in endocrinology, diabetes, and metabolism, in December of 2004 for her sleep apnea.  (R. at 226-27.)  Dr. Haddad told Dr. Colopinto that during the sleep study another physician noticed that Claimant had an enlarged thyroid, though Claimant was not aware of this ailment.  (R. at 226.)  Dr. Haddad stated that during the prior two years Claimant showed symptoms of dysphagia[31] and dyspnea.   (Id.)  Dr. Haddad noted that

---

[31]  Dysphagia occurs when one has difficulty in swallowing. Stedman's Medical Dictionary 599 (28th ed. 2006).

Claimant gagged after eating small amounts of food and had
difficulty swallowing her saliva without choking at night.  (Id.)
Claimant also complained about her breathing patterns worsening.
(Id.)  Finally, Dr. Haddad noted that Claimant had a very large
goiter[32] "with compressive symptoms of both dyspnea and
dysphagia."  (R. at 227.)  Dr. Haddad recommended that she have a
total thyroidectomy[33] based on her symptoms.  (Id.)  Dr. Haddad
also recommended that Claimant needed better blood pressure
control before the surgery and possibly a stress test.  (Id.)

Dr. Colopinto ordered a cardiovascular examination conducted
by Dr. Richard Perlman ("Dr. Perlman"), a cardiologist, on
February 16, 2005.  (R. at 222.)  Dr. Perlman noted that Claimant
appeared to be in "no acute distress and obese."  (Id.)  The
Head, Ear, Eye, Nose, and Throat ("HEENT") Exam revealed "the
head to be normocephalic[34] and atraumatic.  Pupils [were] equal,
round, and reactive to light and accommodation.  Extraocular
movements [were] intact.  The oral pharynx [was] moist.  A goiter
[was] present.  There [was] no evidence of [jugular venous

---

[32]  A goiter is a chronic enlargement of the thyroid.
Stedman's Medical Dictionary 824 (28th ed. 2006).

[33]  Thyroidectomy is a procedure that involves the removal
of the thyroid gland.  Stedman's Medical Dictionary 1988 (28th
ed. 2006).

[34]  Normocephalic is a term used to describe a skull of
normal size.  Stedman's Medical Dictionary 1331 (28th ed. 2006).

distension [35]] or carotid bruits."[36]  (Id.)  The Lung Exam

revealed that there were no "rales[[37]], rhonchi[[38]], wheezes, or

use of accessory muscles."  (Id.)  The Cardiac Exam revealed that

Claimant's heart rhythm was regular, "[her] S1 and S2 [were]

normal, [and] there is no S3 or S4 gallop, murmur, click or

rub."[39]  (Id.)  The Abdomen Exam revealed that the "abdomen [was]

soft, nontender without palpable organomegaly."[40]  (Id.)  The

Extremities Exam revealed "[there was] no clubbing, cyanosis or

edema."  (Id.)  Peripheral pulses "[were] normal, [and the

_____

[35]  Jugular Venous Distention (JVD) occurs when the veins in
the jugular (throat and neck area) are enlarged or stretched.
Stedman's Medical Dictionary See 573, 1017, 1019, 2112 (28th ed.
2006).

[36]  Carotid bruits is a systolic (pertaining to the
contraction of the heart) murmur heard in the neck.  It occurs
when there is turbulent blood flow in a carotid artery.
Stedman's Medical Dictionary 273, 1929 (28th ed. 2006).

[37]  A rale or a crackle is a term used to describe the sound
heard during "auscultation" of breathing.  Stedman's Medical
Dictionary 1626 (28th ed. 2006).

[38]  Rhonchi are sounds "with a musical pitch occurring
during inspiration or expiration, heard on auscultation of the
chest and caused by air passing through bronchi that are narrowed
by inflamation, spasm of smooth muscle, or presence of mucus in
the lumen."  Stedman's Medical Dictionary 1693 (28th ed. 2006).

[39]  S1, S2, S3, and S4 refers to the sounds of the heart
("noise made by muscle contraction and the closure of the heart
valves during the cardiac cycle").  Stedman's Medical Dictionary
1791 (28th ed. 2006).

[40]  Organomegaly occurs when there is an abnormal enlargement
of the viscera (organs "of the digestive, respiratory,
urogenital, and endocrine systems as well as the spleen, the
heart, and great vessels").  Stedman's Medical Dictionary 1380,
2135, 2136 (28th ed. 2006).

distal pulses [were] normal." (Id.)  The Neurologic Exam
revealed Claimant was "oriented to person, time, and place; [her]
gait [was] grossly normal; [and she had] no gross motor-sensory
deficits." (Id.)  Dr. Perlman assessed that Claimant's Thyroid
Disease was "unspecified," there was a family history of ischemic
heart disease,[41] she had hyperlipidemia,[42] her hypertension was
benign, she was obese, and she had sleep apnea. (Id.)

On February 24, 2005, Dr. Perlman gave Claimant a stress
test. (R. at 219.)  Claimant's medications at the time were
DynaCirc CR, Lipitor,[43] and Micardis HCT. (Id.)  Dr. Perlman
noted that her resting heart rate was 94 and her resting blood
pressure was 186/96. (Id.)  Claimant finished three minutes of
the Bruce Protocol[44] and her blood pressure was 220/90 with a
heart rate of 149. (Id.)  In regards to her stress performance
her blood pressure response was hypertensive. (Id.)  The stress

_____

[41] Ischemic heart disease is also known as coronary heart
disease. Dorland's Illustrated Medical Dictionary 538, 543 (31st
ed. 2007).

[42] Hyperlipidemia occurs when there are elevated levels of
lipids in the blood plasma. Stedman's Medical Dictionary 922
(28th ed. 2006).

[43] Lipitor is a prescription drug use to treat
cardiovascular diseases. Physicians' Desk Reference 2459 (62d
ed. 2008).  Claimant was prescribed this drug to treat her
hyperlipidemia. (R. at 222.)

[44] Bruce protocol is a "standardized protocol for
electrocardiogram-monitored exercise using increasing speeds and
elevations of the treadmill; [this is] a test for ischemia
usually due to coronary artery disease." Stedman's Medical
Dictionary 1584 (28th ed. 2006).

test was terminated because Claimant experienced dyspnea and fatigue.  (Id.)  The assessment for this test revealed that the Claimant's hypertension was benign and that she has a family history of ischemic heart disease.  (R. at 220.)

Dr. Haddad wrote to Dr. Colopinto on April 14, 2005 to give a follow-up regarding the thyroidectomy he recommended for Claimant.  (R. at 224.)  Dr. Haddad noted that Claimant had a "left hemithyroidectomy"[45] due to her poor blood pressure.  (Id.) Dr. Dean Drezner, an otolaryngology[46] surgeon, performed Claimant's surgery and he removed a large benign nodular goiter. (Id.)  Dr. Haddad stated that Claimant "noted that her symptoms had improved 100% [and] she no longer [had] positional dyspnea at night, [had] no dysphagia, and all of the compressive symptoms had disappeared."  (Id.)

July 5, 2005 is the last time the Office of Hearings and Appeals brought Claimant's file up to date.  (R. at 132.) Claimant's most recent prescriptions included: Micardis HCT and DynaCirc CR in 2000 for her heart and hypertension; Lipitor and

---

[45]   A hemithyroidectomy is the removal of half of the thyroid gland tissue.  Taber's Cyclopedic Medical Dictionary 961 (20th ed. 2005).

[46]   Otolaryngology is the branch of medical science that includes otology (the science dealing with ear functions and diseases), rhinology ("the science of the nose and its diseases"), and laryngology ("the specialty of medicine concerned wit the pharynx, throat, larynx, nasopharynx and tracheobronchial tree").  Taber's Cyclopedic Medical Dictionary 1206, 1551, 1910 (20th ed. 2005).

Celebrex in 2002 for her high cholesterol; and Fluoxetine in 2003 for her depression. (Id.) All of these medications were prescribed by Dr. Colopinto. (Id.) Claimant's non-prescription drugs include: (1) Singular for her asthma; (2) APAP/COD[47] for the pain caused by her fibromyalgia; (3) Pantanol for her dry eyes; and (4) Ciclopirox for her infected foot. (Id.)

On October 10, 2005, Claimant's last visit with Dr. Colopinto, he ran multiple tests on Claimant, however, there are no documents listing the conclusions Dr. Colopinto made from these tests. (R. at 277-278.)

On December 30, 2006 Claimant visited OFHC for a refill of her medications, she weighed 283 pounds and her blood pressure was 170/100. (R. at 165.)

        4.   Consultative Exams

On October 21, 2004, DDS requested that Claimant see Dr. Ken Klausman ("Dr. Klausman") to undergo an internal medicine consultative exam. (R. at 207.) He was referred as the medical reviewer of Claimant's medical history. (R. at 205.) Dr. Klausman noted Claimant's past impairments, which included: fibromyalgia, asthma, congestive heart failure, sleep apnea and goiter. (R. at 208-09.) The results of Claimant's physical examination conducted by Dr. Klausman were as follows:

        [Claimant walked] with the use of a cane with

_____

[47] APAP/COD is a pain reliever prescribed by Dr. Colopinto to treat Claimant's fibromyalgia. (R. at 132.)

a slow, waddling gait favoring her left leg.
She [got] on and off the examination table
with difficulty and needs assistance to go
from sitting to standing up and from lying to
sitting.  She [had] a hacking cough. . . .
Vital signs [were] as follows: Height [was] 64
inches, weight [was] 300 pounds, blood
pressure [was] 130/80, pulse of 76,
respirations [were] 18. HEENT: Normocephalic.
[Pupils Equally Round and Reactive to Light
("PERRL")], [Extraocular Muscle Intact
("EOMI")]. Sclerae[48] [were] anicteric,
conjunctivae[49] [were] pink. Funduscopic[50] exam
[was] within normal limits bilaterally.
Visual acuity without glasses, right eye [was]
20/30, left eye [was] 20/30, both eyes [were]
20/30. Ears: Tympanic membranes within normal
limits bilaterally.  There [was] no discharge.
Nose: Nasal mucosa [was] within normal limits.
Nasal septum [was] midline.  The teeth [were]
in fair state of hygiene and repair.  Neck
[was] supple.  Thyroid [was] enlarged
bilaterally, left greater than right.  There
[was] no lymphadenopathy or bruit.  Chest:
Normal chest configuration.  Lungs reveal[ed]
diffuse end expiratory wheeze and basilar.
Heart [was at a] regular rate and rhythm. . .
. There [was] a 2/6 systolic murmur in the
left sternal border.  PMI [was] not palpable
secondary to obesity.  Abdomen [was] obese.
There [was] no palpable organomegaly nor
masses nor ascites nor rebound.  Straight leg
raise [was] negative at 60 degrees
bilaterally.  Knee extension, flexion strength
testing [was] 4/5 bilaterally.  There [was] +2

---

[48]  Sclerae is the "portion of the fibrous layer forming the
outer envelope of the eyeball, except for . . . the cornea."
Stedman's Medical Dictionary 1732 (28th ed. 2006).

[49]  Conjunctivae is the mucous membrane that lines the inner
surface of the eyelid and the exposed surface of the eyeball.
Stedman's Medical Dictionary 431 (28th ed. 2006).

[50]  A funduscopic exam is an examination of the fundus ("the
bottom . . . part of a sac or hollow organ; the farthest part
removed from the opening").  Stedman's Medical Dictionary 777,
778, 1374 (28th ed. 2006).

> pedal edema bilaterally. Knee jerks [were]
> not assessed secondary to bilateral knee
> tenderness. . . . Right hand grip [was] 30
> pounds, left hand grip [was] 40 pounds.
> Examination of the hands revealed callus on
> the dorsal aspect of the right second, third
> and fourth metacarpal. Fine hand motor
> movements within normal limits bilaterally.
> Extensor hallucis longus [was] 2+ bilaterally.
> Lumbar range of motion in flexion 90,
> extension 25, right lateral flexion 30, left
> lateral flexion 30. Neurological exam: The
> claimant was alert, oriented times three . . .
> . She [was] cooperative for the examination.

(R. at 209.) Dr. Klausman noted that Claimant suffered from

morbid obesity and asthma, and had a history of both congestive

heart failure and fibromyalgia . (Id.)

Dr. Jose Gonzalez-Acurra ("Dr. Gonzalez-Acurra"), a

physician from DDS, performed an assessment of Claimant's RFC on

November 11, 2004. (R. at 211.) In regards to Claimant's

exertional limitations, DDS noted that Claimant could

"occasionally" lift twenty pounds; she could "frequently" lift

ten pounds; she could stand and/or walk for less than two hours

in an eight-hour workday (required to have a "hand-held assistive

device" for ambulation); she could sit for a total of six hours

in an eight-hour workday; and she had limited strength in her

lower extremities in regards to pushing and/or pulling objects.

(Id.) Dr. Gonzalez-Acurra concluded that there was an

"insufficient [amount of] evidence prior to the date last insured

through which to assess the allegations and their limiting

implications." (R. at 212.) Dr. Gonzalez-Acurra further noted:

> [Claimant] allege[d] needing a wheelchair for
> shopping and can walk only 30 ft. to ½ a
> block, and inability to efficiently perform
> [activities of daily living]. 3/90, cervical
> [degenerative joint disease]. 2/02 ECHO,
> severe concentric [left ventricular
> hypertrophy] w/nl wall motion, pericardial
> effusion. 5/04 methacholine challenge
> supportive of asthma (hs. shows no frequent
> decompensations), sleep study supportive of
> severe sleep apnea, [treating physician]
> ordered CPAP. 6/04 [treating physician]
> note[d], claimant need[ed] cane for all
> surfaces because of [degenerative joint
> disease] (need clear, dx not fully supported).
> 10/04, BP 130/80, 64" 300lbs., cane-assisted
> waddling gait w/L-Limp, [had] problems
> w/positional changes, RR 18, neck supple, end-
> expiratory wheeze, L/S flex 90 deg. w/SLR
> negative, bilat knee tenderness w/strength
> 4/5, dexterity wnl.  The allegations of
> [congestive heart failure], headaches and
> fibromyalgia cannot be assess[ed] with the
> total evidence. [Blood pressure] has not been
> limiting.  Can stand/walk a total of 1 hour
> per routine workday, needs cane at all times,
> no frequent pushing/pulling w/LE, stairs
> should be limited to one flight twice daily to
> get to and from a worksite, less than moderate
> respiratory and no physical hazards.

(R. at 211-12.)

As to her postural limitations, Dr. Gonzalez-Acurra noted
that Claimant could "never" balance herself and could
"occasionally" climb ramps or stairs, stoop, kneel, crouch, and
crawl.  (R. at 213.)  During the manipulative limitations
assessment Dr. Gonzalez-Acurra found that Claimant was unlimited
in reaching in all directions, handling, fingering, and feeling.
(R. at 214.)  Visual or communicative limitations were not
established for this assessment.  (Id.)  Claimant's environmental

30

limitations included: (1) an unlimited amount of exposure to

"wetness, noise, [or] vibrations ;" (2) total avoidance to

concentrated exposure to "extreme cold, extreme heat, [and]

humidity ;" (3) total avoidance of moderate exposure to "fumes,

odors, dusts, gases, poor ventilation, etc.;" (4) total avoidance

to all exposures to "hazards (machinery, heights, etc.)." (R. at

215.)

Lastly, Dr. Gonzalez-Acurra discussed whether:

> [Claimant's] symptoms [were] attributable, in
> [his] judgment, to a medically determinable
> impairment. The severity or duration of the
> symptoms, in [his] judgment, is
> disproportionate to the expected severity or
> expected duration on the basis of [Claimant's]
> medically determinable impairments. The
> severity of the symptoms and their alleged
> effect on function [was], in [his] judgment,
> with the total medical and non-medical
> evidence, including statements by [Claimant]
> and others, observations regarding activities
> of daily living, and alterations of usual
> behavior or habits.

(R. at 216.)

Based on his judgment, Dr. Gonzalez-Acurra noted that

Claimant's symptoms of knee pain, lower back pain, and shortness

of breath "are attributable to the medically determinable

impairments of asthma, knee and leg strain, and morbid obesity."

(Id.) The severity of these pains were proportionate to the

expected severity or duration based on the impairments and a

review of the total evidence. (Id.) Additionally, "the severity

of the symptoms and its alleged effect on [Claimant's] functions

31

[were] consistent with the total evidence." (Id.)  Dr. Gonzalez-Acurra stated that Dr. Goldstein's findings were inconsistent with his findings. (R. at 217)  Specifically, Dr. Gonzalez-Acurra noted that Dr. Goldstein alleged that Claimant was "totally disabled," however, Dr. Gonzalez-Acurra concluded that she was not disabled. (Id.)  Dr. Gonzalez-Acurra opined that there was no "substantiating documentation" that could support Dr. Goldstein's finding of such a degree of disability. (Id.)

### C.  **ALJ's Findings**

Proceeding through the five-step analysis outlined in 20 C.F.R. § 404.1520, the ALJ found that Claimant was not disabled within the meaning of the Social Security Act prior to September 30, 1997. (R. at 25.)  First, he concluded that Claimant had not engaged in substantial gainful activity since January 3, 1994. (Id.)  Second, he held that Claimant had five severe impairments during the relevant time: asthma, obesity, disorders of the back, degenerative joint disease, and hypertension. (Id.)  He found that the medical evidence did not establish that Claimant's impairments met or equaled the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. Pt. 404, Subpt. P, App. 1.) (Id.)

Third, the ALJ determined that Claimant's allegations regarding her limitations during the relevant time period (January 3, 1994 to September 30, 1997) were not totally

32

credible.  (R. at 25.)  Fourth, he found that Claimant retained
the RFC to perform the exertional demands of light work.  (Id.)
Light work includes:

> [L]ifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects
> weighing up to 10 pounds.  [A] job is in this
> category when it requires a good deal of
> walking or standing, or when it involves
> sitting most of the time with some pushing and
> pulling of arm or leg controls.  To be
> considered capable of performing a full or
> wide range of light work, you must have the
> ability to do substantially all of these
> activities. If someone can do light work, we
> determine that he or she can also do sedentary
> work, unless there are additional limiting
> factors such as loss of fine dexterity or
> inability to sit for long periods of time.

20 C.F.R. 404.1567(b).

However, that finding conflicts with the ALJ's statement
that "the claimant's capacity for light work during the period at
issue was *diminished by significant additional limitations."*  (R.
at 18, 25.) (emphasis added).  This may have reflected confusion
on the ALJ's part because instead of listing any such limitation,
the ALJ found "she was able to lift/carry ten pounds frequently
and twenty pounds occasionally; could walk for six hours in an
eight-hour workday; was able to stand for six hours in an eight-
hour workday; could sit for six hours in an eight-hour workday;
could occasionally climb; and needed to avoid exposures to
hazards such as machinery and heights," (id.), which are the
typical demands of light work.

Fifth, the ALJ found that Claimant's past relevant work as a teacher did not require the performance of work functions precluded by her medically determinable impairments.  (R. at 25.)  Finally, he found that before her DIB expired on September 30, 1997, Claimant was not prevented from performing her past relevant work.  (<u>Id.</u>)

Within the ALJ's findings he disputed Claimant's testimony regarding her knee surgery because there was no documentation that any doctor suggested knee replacement surgery.  (R. at 22.)  The ALJ also disputed Claimant's testimony regarding her need for a cane, noting a lack of documentation that any of her doctors prescribed the use of cane on or before September 30, 1997, the date she was last insured.  (<u>Id.</u>)

In addition, the ALJ disputed Dr. Goldstein's finding that Claimant was totally disabled and that she suffered from fibromyalgia and arthritis because there was only one record of an appointment with Dr. Goldstein, and the stationery that the diagnoses were written on was not signed by the doctor.  (R. at 20-21, 145.)  The ALJ found that Dr. Goldstein's opinion about her disability was not supported by any objective clinical or laboratory findings, thus he rejected the doctor's opinion.  (R. at 21.)  Finally, the ALJ concluded that Claimant was not disabled.  (R. at 25.)

## II.   DISCUSSION

### A.   <u>Disability Defined</u>

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB and SSI benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled,

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained.  20 C.F.R. § 404.1520(a).  The five-step process is summarized as follows:

35

1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."

2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is "disabled."

4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."

5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence.  In the final step, however, the

Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas, 823 F.2d at 777.

## B.   Standard of Review

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C.A §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993). "Substantial evidence" means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d at 1213.  Thus, substantial evidence may be slightly less than a preponderance. See Hanusiewicz v. Bowen, 678 F. Supp. 474, 476 (D.N.J. 1988).

Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy
> the substantiality test if the [Commissioner]
> ignores, or fails to resolve, a conflict

37

> created by countervailing evidence.  Nor is
> evidence substantial if it is overwhelmed by
> other evidence - particularly certain types of
> evidence (e.g. that offered by treating
> physicians) - or if it really constitutes not
> evidence but mere conclusion.

Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court, however, does have a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).  The Commissioner has a corresponding duty to facilitate the court's review: "Where the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches

> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at her decision by application of the proper legal standards. Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

C.   **Analysis**

1.   Whether the ALJ Failed to Follow the Social Security Ruling in Determining the Onset Date of Disability

It is conceded that Claimant's insurance period expired after September 30, 1997.  Therefore, in order to receive DIB, she must have been disabled on or before that date.

Claimant argues that because the ALJ acknowledged the existence of impairments prior to September 30, 1997 that eventually became disabling, according to the Commissioner, the ALJ had an obligation to determine the severity of these impairments prior to September 30, 1997 and procure expert advice

39

in determining the onset date of disability.  (Claimant's Br. at 15-20.)  The ALJ did not determine an onset date of disability in regards to Claimant's DIB application because he found that she was not disabled during the relevant time period.  (R. at 24.) In response, Defendant argues that there is no need for a medical expert's advice regarding the onset date of disability because there were adequate medical records during the relevant time period that made no showing that Claimant was disabled.  (Def's Br. at 12-14.)

When Claimant's impairments are progressive in nature, "determining the proper onset date is particularly difficult when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 548 (3d Cir. 2003); Walton v. Halter, 243 F.3d 703, 708 (3d Cir. 2001) (citing SSR 83-20, 1983 WL 31249 at *2).  In this situation the ALJ must use a medical expert to help him infer the onset date of disability. Id.  Newell held that because the claimant lacked treatment records for her impairments prior to the expiration of her insured status due to her inability to pay for medical treatment,[51] the ALJ erred in not seeking the advice of a medical

---

[51]   In Newell, the court held that the inability to afford medical treatment was an adequate explanation for a claimant who does not have medical records during the relevant time period. The opinion quotes SSR 96-7p, 1996 WL 374186 at *7, where it states that "the adjudicator must not draw any inferences about

40

expert to determine her onset date of disability.  347 F.3d at
547.  In Walton, the claimant also lacked medical records during
the relevant time period, however, all of the medical evidence
after the date last insured suggested an onset date prior to the
expiration of his insured status.  243 F.3d at 709.  In that
instance where the medical evidence was ambiguous, the Walton
court held that the ALJ erred because he failed to procure a
medical advisor to determine the claimant's onset date of
disability.  Id.

     In the present case, the ALJ did not err in not obtaining
medical advice to determine Claimant's proper onset date of
disability because the ALJ had access to adequate medical records
from the relevant time period.  Claimant alleged in her testimony
during the hearing with the ALJ and on her current DIB and SSI
applications that she could no longer work because the pain in
her knees and arms became progressively worse in January of 1994.
(R. at 87, 307-08.)  However, the ALJ used the medical records to
determine that Claimant was not disabled.  During the relevant
time period the only indication that Claimant could be disabled
was the note submitted by Dr. Goldstein.  Given the

_____

an individual's symptoms and their functional effects from a
failure to seek or pursue regular medical treatment without first
considering any explanations that the individual may provide, or
other information in the case record, that may explain infrequent
or irregular medical visits or failure to seek medical
treatment."  347 F.3d at 547.

inconsistency, the ALJ properly acknowledged Dr. Goldstein's finding that Claimant was "totally disabled" in 1990. (R. at 21, 145.)  However, because Dr. Goldstein failed to substantiate his finding with test results and clinical observations, the ALJ had the authority to reject his finding.[52]  (R. at 21.)

Claimant's medical records were adequate enough for the ALJ to review Claimant's DIB application, though the ALJ noted gaps within Dr. Colopinto's treatment records.  However, because Dr. Colopinto reported that he only saw Claimant every two to six months, these gaps in the record do not equate to inadequate medical records like those in Newell and Walton where an expert was needed.  Additionally, during the last gap that the ALJ acknowledged (June 25, 1996 to February 19, 1998) Claimant began treatment at OFHC on July 19, 1996 to July 21, 1997.  (R. at 183-94.)  The ALJ only acknowledged these gaps in the medical record to show that the lack of Claimant's need for treatment diminished her allegation of being disabled.  (R. at 20.)

The ALJ is not required to consult a medical expert whenever impairments are progressive in order to determine the onset date of disability, as Claimant suggests.  The Social Security Rulings call for the impairments to not only be progressive in nature,

---

[52]  A treating physician's opinion as to the onset date of disability, when supported by test results and clinical observations, should be determinative.  Stevens v. Secretary, HHS, 689 F. Supp. 517 (W.D. Pa. 1988).

but there must be a lack of adequate medical records regarding the impairments.  Because the ALJ based his determination on the proper elements required by the Social Security Rulings, the Court finds no cause to remand this case based on this issue.

> 2.   Whether the Decision of the ALJ as to the Claimant's Residual Functional Capacity was Inconsistent with His Finding

Claimant argues that the inconsistencies and lack of clarity within the ALJ's determination of her RFC makes his decision unreasonable and unsupported by substantial evidence. (Claimant's Br. at 21-23.)  The ALJ determined both that Claimant retained an RFC of light work, the level needed for teaching,[53] and that there were "significant additional limitations" in her ability to perform light work.  (R. at 25.)  Defendant argues that Claimant did not meet her burden of proving that she could not do her past relevant work, and thus that the ALJ had substantial evidence to support his determination that Claimant had the RFC to return to her past relevant work.  (Def.'s Br. at 6-12.)

To promote judicial efficiency, hearing examiners should be thorough.  This provides the reviewing court with greater ease in reviewing an appeal.  The Third Circuit has held that the ALJ's

---

[53]   The Dictionary of Occupational Titles characterized the secondary level teaching profession as light exertional work. DOT 091.227-010.

findings should be "as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based so that a reviewing court may know the basis for the decision." Baerga v. Richard, 500 F.2d 309, 312 (3d Cir. 1974). In Fargnoli v. Massanari, the Court ruled that "the ALJ's finding of [RFC] must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.'" 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Findings that are comprehensive enable the Court to properly review the validity of the Commissioner of Social Security's decision, as required by the Social Security Act. See 42 U.S.C. § 405(g).

The ALJ's discussion of Claimant's capacity to return to her past relevant work included: (1) Dr. Colopinto's assessment of Claimant's physical capacity, which noted she was capable of performing a limited range of light work, but declined to specifically define her work-related physical capacity (R. at 251); (2) Dr. Colopinto's extensive treatment records documenting diagnoses of hypertension, congestive heart failure, and arthritis (R. at 228-94); (3) Dr. Siddiqi's assessment regarding Claimant's degenerative joint disease, where he noted that Claimant had "some spondylitic changes in her cervical spine" (R. at 144); (4) the treating record obtained from the OFHC, which

44

noted her weight, blood pressure, history of medication, and
diagnosed her with hypertension and obesity (R. at 165-92); (5)
the State Agency's examination and assessment of Claimant's RFC
(R. at 211-18); and (6) the ALJ's finding that Claimant's
subjective complaints were only credible to the extent that they
were consistent with an ability to perform light work (R. at 17-
22).

It appears, however, that there is a contradiction in the
language the ALJ used to describe the Claimant's physical
capacities and her ability to return to her past relevant work.
The Court is unclear as to what the ALJ's findings were.  He
determined that Claimant retained the RFC for light work and
could return to her past relevant work as a teacher.  (R. at 25.)
However, the ALJ also stated that Claimant's capacity to do light
work had "significant additional limitations."  (Id.)  The ALJ
failed to list and extrapolate on these additional limitations,
or to explain how they affected her ability to perform her past
work.

As stated above, the ALJ is required to give a statement of
subordinate factual foundations on which the ultimate findings
rest.  Although it may be that the apparent contradiction
reflects a typographical error, the Court cannot make that
determination on the record before it.  Because the ALJ failed to
address what the aforementioned limitations were or how they

45

affected Claimant's capacity to return to her past relevant work,
the Court cannot affirm the Commissioner's determination that
Claimant is not disabled.  Given the contradiction within his
conclusion, the Court shall remand for an explanation.

3.   Whether the ALJ Failed to Analyze the Impact of
Claimant's Obesity

Claimant argues that the ALJ failed to note the severity of
her obesity, and in turn failed to explain how it impacted her
RFC.  (Claimant's Br. at 22.)  Within the ALJ's analysis of
Claimant's impairments, he noted that all of her impairments did
not meet the severity level within the Listing of Impairments.
(R. at 25.)  In response, Defendant argues that the ALJ did not
ignore her obesity in its entirety by noting her weight in
several places.  (Def.'s Br. at 12.)

The ALJ must consider and examine all evidence in the
record.  Cotter v. Harris, 642 F.2d 700.  In addition, an ALJ's
RFC finding must be supported by the medical evidence.  Doak v.
Heckler, 790 F.2d 26, 29 (3d Cir. 1986).  During step three of
the disability analysis, the ALJ must determine whether
Claimant's impairments during the insured time period matched or
were equivalent to one of the listed impairments, and if they
were equivalent, then the Claimant is *per se* disabled.  Burnett
v. Comm'r of Soc. Sec. Admin., 220 F.3d 119 (3d Cir. 2000)
(citing Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999)).  In

46

addition, however, in performing the function-by-function
assessment, the ALJ must assess Claimant's impairments, and
related symptoms, such as pain, that may have an affect on
Claimant's ability to perform her past work.  20 C.F.R. §
404.1545(a)(1).  An ALJ "will consider *all* of the medically
determinable impairments" of which he is aware, including those
that are determined to be non-severe.  20 C.F.R. §
404.1545(a)(2); 20 C.F.R. § 404.1545(e) (emphasis added).

   The ALJ noted: "[Claimant] suffered from asthma, *obesity*,
disorders of the back, degenerative joint disease, and
hypertension; impairments which were severe but did not meet or
equal the criteria of any of the impairments listed in Appendix
1, Subpart P, Regulations No. 4 [20 C.F.R. Pt. 404, Subpt. P,
App. 1]."  (R. at 25.) (emphasis added).  However, it is apparent
in evaluating the severity of Claimant's impairments and her RFC,
the ALJ only considered four out of the five noted impairments –
asthma, disorders of the back, degenerative joint disease, and
hypertension.  (R. at 15-17.)  In making his function-by-function
assessment of Plaintiff's abilities, the ALJ improperly
disregarded evidence relating to Claimant's obesity.  (R. at 17-
22.)  Since the ALJ never considered Claimant's obesity at Step
Three, his analysis was also flawed at Step Four with regard to
determining Claimant's RFC.

   The ALJ never discussed how Claimant's obesity impacts or

limits her ability to perform her past relevant work.  The ALJ's only mention of Claimant's weight was within his discussion of her treatment records from OFHC.  (R. at 19.)  The ALJ noted that Claimant's weight at the time and that she was advised to exercise.  (Id.)  However, he did not explain how her obesity during the relevant time period could affect her ability to perform the basic functions of her job nor note any contradictions or inconsistencies to refute her diagnosis of obesity.  (Id.)

Because the ALJ failed to explain how Claimant's obesity impacted her RFC, the Court cannot uphold the determination.  The ALJ did not fully explain his determination that Claimant was not disabled and could perform her past relevant work.  Accordingly, the Court must remand for an explanation of the impact that Claimant's obesity had on her abilities during the insured period.

### III. CONCLUSION

For the reasons explained above, the Court shall affirm the ALJ's determination of Claimant's last insured date, which is September 30, 1997.  However, the Court shall remand this matter to the Social Security Administration for an explanation of the Commissioner's findings that Claimant is able to do her past relevant work, given the apparent determination that her capacity was "diminished by significant limitations" in her ability to

perform light work.  In addition, the Commissioner must provide
an explanation of the severity of Claimant's obesity and how it
relates to her RFC during the insured period.  This analysis
should include a function-by-function assessment of Claimant's
abilities and how they relate to her past job as she performed
it.  An appropriate Order shall be entered.


**July 31, 2008**                         **s/Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           U.S. District Judge